**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| PRIDE ACQUISITIONS, LLC,<br>Plaintiff, | : | CIVIL ACTION NO.<br>3:12-cv-639 (JCH) |
| v. | : | |
| ABEL OSAGIE,<br>Defendant, Third-Party Plaintiff, | : | |
| v. | : | |
| JPMORGAN CHASE BANK, N.A.,<br>Third-Party Defendant. | : | SEPTEMBER 29, 2014 |

**RULING RE: MOTIONS FOR SUMMARY JUDGMENT (Docs. No. 51, 55-1, 62)**

On March 30, 2012, third-party plaintiff Abel Osagie filed a First Amended Third Party Complaint (the "Complaint") (Doc. No. 1 at 71–90) against third-party defendant JPMorgan Chase Bank, N.A. ("JPMC") in the Superior Court, Judicial District of Danbury, State of Connecticut. He asserts that JPMC is liable for: breach of contract (Count I), violation of the covenant of good faith and fair dealing (Count II), violation of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 et seq. (Count III), negligence (Count IV), and violation of the Connecticut Unfair Trade Practices Act (CUTPA) (Count V). On April 27, 2012, invoking this court's jurisdiction to hear cases involving a federal-law claim, JPMC removed the action to this court. See Notice of Removal (Doc. No. 1); 28 U.S.C. § 1441. The parties have submitted a series of pleadings in which Osagie moves for summary judgment on Counts I and III and JPMC moves for summary judgment on all counts.

# I. FACTS[1]

## A. The Account; JPMC requests that Osagie re-sign agreement

This case revolves around a $184,500 home equity line of credit (the "Account") that JPMC extended to Osagie with a loan modification agreement (the "Modified Agreement") (Doc. No. 53 at 33–35) executed on May 30, 2007.[2] See Nauman Affidavit (Doc. No. 59-1) ¶ 7; JPMC L.R. 56(a)(1) Stmt. (Doc. No. 57-1) ¶ 9; Osagie L.R. 56(a)(2) Stmt. (Doc. No. 66-1) ¶ 9; Osagie L.R. 56(a)(1) Stmt. (Doc. No. 53) ¶ 4; JPMC L.R. 56(a)(2) Stmt. (Doc. No. 64-1) ¶ 4.[3] Before that time, Osagie had had an "open-end mortgage" loan (the "Open-End Mortgage Agreement") (Doc. No. 53 at 36–38; Doc. No. 53-1 at 1–3) for $82,000, originally executed on May 2, 2003. See Nauman Affidavit ¶ 6; Osagie L.R. 56(a)(1) Stmt. ¶ 5; JPMC L.R. 56(a)(1) Stmt. ¶ 6.

---

[1] The facts as stated for the purposes of this Motion for Summary Judgment correspond to the undisputed facts in the parties' Local Rule 56(a) Statements except as noted.

The court notes that much of this recitation of facts is taken entirely from Osagie's description of events in his pro se submissions because JPMC—which is, needless to say, represented by counsel—provides no evidence of any kind to controvert much of the sworn statements and other evidence that Osagie proffers and to which he provides numerous citations. Frequently it only flatly denies or states an inability to admit or deny the facts that Osagie gives in the statement of material facts that is among the papers submitted to the court. This nonresponse by JPMC constitutes a failure to comply with the rules governing summary judgment motions, including Local Rule 56(a)(2), (3). The latter requires that, in denying facts asserted in connection with a motion for summary judgment, "each denial . . . must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." District of Connecticut Local Rule 56(a)(3). "[F]ailure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted." Id. It does not, for example, cite to any affidavit by a representative who spoke with Osagie. The court deems this failure to respond an admission, for purposes of the present motions, of the allegations that Osagie supports with admissible evidence.

[2] The account is jointly held by Osagie and his wife Alaba. She is not, however, a party to the present action. In this Ruling, references are to Abel Osagie alone.

[3] With each subsequent citation to a Local Rule 56(a)(1) Statement, the court implies a corresponding reference to the respective paragraph(s) of the other party's responsive Local Rule 56(a)(2) Statement.

On numerous dates in 2007 and 2008, JPMC, apparently having lost the original documents, sent letters or other contact to Osagie explaining the need for him to re-sign the relevant loan documents. See Osagie L.R. 56(a)(1) Stmt. ¶ 7 (JPMC kept the original document); JPMC L.R. 56(a)(1) Stmt. ¶¶ 10–25 (contacts via mail). From the submissions of the parties, JPMC claims to have sent numerous letters, at least some of them warning that, if Osagie did not sign such documents, JPMC would put a block on his account; that Osagie responded to the contacts in at least some cases, at least once explained that he was out of the country, at least once refused—for security reasons—to send documents while he was out of the country; and eventually told JPMC that he would not re-sign the loan documents. Osagie attests that he sent the re-documentation multiple times and presents return receipts for a package sent via the United Parcel Service. See Osagie Affidavit ("Osagie Aff.") (Doc. No. 53 at 14) ¶ 20; Package Return Receipts (Doc. No. 53-1 at 6–7).

B. The block on the Account and fallout

On June 30, 2008, JPMC put a block on Osagie's account. See JPMC L.R. 56(a)(1) Stmt. ¶ 27. The record does not reflect, and JPMC does not claim, let alone point to any evidence, that it took any steps to notify Osagie of the block at that time. An account statement that Osagie presents reflect that, as of that date, the balance on the Account was $170,731.62. See Home Equity Line of Credit Statement as of 7/21/2008 (Doc. No. 53-1 at 10). On July 18, JPMC accepted from Osagie $1,707.31, which paid off part of the month's accrued interest and part of the principal of the loan, much as it had one month prior. See id. With that and an interest charge of $612.64, as of the next statement date, July 21, the Account's balance was $169,656.14. See id.

On July 15, 2008, Osagie wrote a check on the Account for $4,000 and deposited it with Bank of America. See JPMC L.R. 56(a)(1) Stmt. ¶ 28. JPMC declined to honor the check. See id. ¶ 29. On July 16, 2008, Osagie called JPMC to inquire why the check was not honored; JPMC refused to give Osagie an answer on the phone and told him that he would receive a reply through the mail. See Osagie L.R. 56(a)(1) Stmt. ¶ 24. Osagie notified JPMC of the urgency of his situation, explaining that he needed the money to complete a project by a certain date and that, if he did not timely complete it, he would breach the contract, lose a great deal of money that he had invested, lose his entitlement to future profits, and be unable to repay the money borrowed from JPMC. See Osagie Aff. ¶ 31. JPMC mailed a Notice dated July 16, 2008 to Osagie notifying him that the check would not be honored "because the check amount would exceed the available credit limit on your account." See Osagie L.R. 56(a)(1) Stmt. ¶ 25.

Osagie called JPMC on July 24, 2008 (the same day that he received the letter, see Osagie L.R. 56(a)(1) Stmt. ¶ 25) for an explanation, telling JPMC that the given explanation—that he had exceeded his credit limit—was inaccurate. See id. ¶ 28. The JPMC representative excused himself, then returned to the phone and said there was "a block" on the account, and that JPMC would send him an explanation in writing. See id. ¶ 28. As before, Osagie notified JPMC of the urgency and details of his situation, including that, if JPMC did not act immediately, he stood to lose a great deal of money. See Osagie Aff. ¶ 33; Osagie L.R. 56(a)(1) Stmt. ¶ 33. He complained of JPMC's lackadaisical attitude respecting his situation. See Osagie L.R. 56(a)(1) Stmt. ¶ 33.

Osagie proffers among his motion papers a five-phase, five-year agreement between himself and the Zembe-Arinze Company ("Zembe-Arinze"), signed on

February 14, 2007. In that agreement, he was entitled to fees and recovery of his costs at each phase, including $200,000 in fees for the first phase, which was scheduled to end July 20, 2008. See Zembe-Arinze Contract (Doc. No. 53 at 27–30); Osagie L.R. 56(a)(1) Stmt. ¶ 5. Osagie had incurred $285,850.86 in costs at the time of JPMC's refusal to honor the $4,000 check. See Deposition of Abel Osagie ("Osagie Depo.") (Doc. No. 60-1 at 4) at 44:10–14. The agreement provides that it shall be "automatically voided" if Osagie fails to perform at the end of any phase. See Zembe-Arinze Contract at ¶ 6 (Doc. No. 53 at 27).

JPMC maintained that it would only send a response by mail. Osagie L.R. 56(a)(1) Stmt. ¶ 33. All communications between Osagie and JPMC related to the signing of the Modified Agreement had been through phone, fax, or email. See Osagie L.R. 56(a)(1) Stmt. ¶ 10.

For the first time since it refused to honor the check, JPMC stated in a letter dated July 25, 2008, the reason for the refusal: "Chase had not received the needed signed documentation from you to record collateral document." See JPMC L.R. 56(a)(1) Stmt. ¶ 30.

Osagie did not go to his friends or elsewhere to seek the $4,000 in funds that he had sought to transfer to the Bank of America account; he attests that he could not find an alternative source for these funds. See Osagie L.R. 56(a)(1) Stmt. ¶¶ 38, 39. He also attests that, because JPMC did not honor the check and because he was unable to obtain the money needed for his project elsewhere, he failed to complete his responsibilities for the phase of the agreement with Zembe-Arinze then in effect. See Osagie L.R. 56(a)(1) Stmt. ¶ 40.

Via letter dated August 15, 2008, Zembe-Arinze voided its contract with Osagie because of Osagie's failure to perform.  See id.; Letter from Peter H. Idemudia to Abel Osagie dated 8/15/2008 (Doc. No. 53 at 31).  As a consequence, Osagie lost his entitlement to recoup his expenses ($285,850.86 at that point, see Osagie Depo. at 44:10–14) and to earn his fee for that phase's completion ($200,000), and also lost the opportunity to earn fees for the remaining four phases of the contract (each in the same amount, in all totaling $800,000).  See Zembe-Arinze Contract.

On October 17, 2008, Osagie informed JPMC of losses that he alleged that he had incurred as a consequence of JPMC's failure to honor the $4,000 check; JPMC refused to provide Osagie with the money that he claimed to have lost.  See Complaint ¶ 28; Osagie Aff. ¶ 42.

In one phone conversation during which Osagie sought to resolve his grievances with JPMC, a JPMC representative told Osagie that, if he did not continue to pay JPMC, JPMC would change the Account's type to "Revolving" and report it to credit reporting agencies as "Past Due."  See id. ¶ 43.  On October 20, 2008, JPMC initiated foreclosure proceedings upon the home subject to the mortgage associated with the Account.  See id. ¶ 59.

C.     Changes in the Account's description to credit reporting agencies

In November or December 2008, in reporting to credit reporting agencies Equifax, Experian, and Transunion, JPMC changed the Account's type from "Mortgage" or "Home Equity Line of Credit," etc. to "Revolving Line of Credit" or "Line of Credit" or "Revolving."  See Osagie L.R. 56(a)(1) Stmt. ¶ 41; Osagie Aff. ¶ 45.  It also reported the Account as "past due."  See Osagie L.R. 56(a)(1) Stmt. ¶ 41; Osagie Aff. ¶ 45.  Osagie

discovered these two changes to how JPMC was reporting the Account and, believing them to be incorrect, contacted the credit reporting agencies to dispute the accuracy, completeness, and classification of the Account.  See Osagie L.R. 56(a)(1) Stmt. ¶¶ 41, 44; Osagie Aff. ¶¶ 45, 47.  The credit bureaus contacted JPMC, and JPMC represented that the Account was not a mortgage but a "line of credit" or "revolving" account, pointing to the monthly payments received from Osagie to support this representation. See Osagie L.R. 56(a)(1) Stmt. ¶ 47; Osagie Aff. ¶ 48.  JPMC in no way modified its reporting of the Account after being contacted with respect to the credit bureaus' investigations, even though it knew that this account was a mortgage loan account, not a revolving line of credit account.  See Osagie L.R. 56(a)(1) Stmt. ¶¶ 43, 46; Osagie Aff. ¶¶ 49, 50.  Because the credit bureaus perceived sufficient proof from JPMC, they did not modify their reporting of the Account in light of Osagie's contestation of its reporting except to note that Osagie disputed the way this account was reported.  See Osagie L.R. 56(a)(1) Stmt. ¶ 47; Osagie Aff. ¶¶ 50, 51.

With this JPMC account being the only one with any adverse reporting on Osagie's credit records, incidents connected to credit checks of Osagie followed.  See Osagie L.R. 56(a)(1) Stmt. ¶ 48; Osagie Aff. ¶ 52.  These included: other creditors limited or withdrew his lines of credit, see Osagie L.R. 56(a)(1) Stmt. ¶ 49; Osagie Aff. ¶ 53; Osagie tried but was unable enroll his child in nursing school using a line of credit, see Osagie L.R. 56(a)(1) Stmt. ¶ 53; Osagie Aff. ¶ 58; and Osagie tried but was unable to complete a Medicare certification of a Home Health Care Agency (an endeavor as to which he had been investing resources for about a year), see Osagie L.R. 56(a)(1) Stmt. ¶ 50; Osagie Aff. ¶ 54.

D. Procedural history

On March 30, 2012, Osagie filed the Complaint against JPMC; on April 27, 2012, JPMC removed the case to this court. See Notice of Removal (Doc. No. 1). Osagie now moves for partial summary judgment on Counts I and III, see Motion for Partial Summary Judgment ("Osagie MPSJ") (Doc. No. 51), Amended Motion for Partial Summary Judgment ("Osagie Amended MPSJ") (Doc. No. 62), and JPMC cross-moves for summary judgment on all counts, see Motion for Summary Judgment ("JPMC MSJ") (Doc. No. 55-1).[4]

## II. STANDARD OF REVIEW

Granting a motion for summary judgment is proper only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." O'Hara v. Nat'l Union Fire Ins. Co., 642 F.3d 110, 116 (2d Cir. 2011). Thus, the court's role in deciding such a motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." Id. In making this determination, the court "must resolve all ambiguities and draw all inferences against the moving party." Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013).

The moving party bears the burden of establishing the absence of genuine issues of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party meets that burden, the party opposing the motion will only prevail if it sets forth "specific facts" that demonstrate the existence of "a genuine

[4] Osagie, with his Motion for Partial Summary Judgment unopposed at the time, submitted an amended motion for partial summary judgment. The court liberally construes Osagie's pro se motions together as one motion.

issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)).

For summary judgment purposes, a genuine issue exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor. See Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 693 (2d Cir. 2012); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating that the non-moving party must point to more than a mere "scintilla" of evidence in its favor). "However, reliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." Davis v. N.Y., 316 F.3d 93, 100 (2d Cir. 2002).

## III. DISCUSSION

### A. Breach of contract (Count I)

Both parties move for summary judgment as to Osagie's breach of contract claim. See Osagie Amended MPSJ at 1–2; JPMC MSJ at 1–2. The court grants Osagie summary judgment as to liability on this claim and denies JPMC the same.

The elements of a breach of contract action are "the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." Rosato v. Mascardo, 82 Conn. App. 396, 411 (2004) (quoting Bouchard v. Sundberg, 80 Conn. App. 180, 189 (2003)). JPMC appears to concede that it did not honor Osagie's $4,000 check and that this failure would constitute breach, see JPMC L.R. 56(a)(1) Stmt. ¶ 29, but argues that Osagie's contract claim fails nonetheless. First, it argues that Osagie's own breach precipitated JPMC's failure to honor the check, and second,

that Osagie failed to mitigate his damages. See JPMC Memorandum in Support of Motion for Summary Judgment ("JPMC Mem.") (Doc. No. 56-1) at 5–9.

1. Preceding breach by Osagie

JPMC first argues that its failure to honor the check did not constitute breach of the contract because Osagie first committed a breach by failing to respond to JPMC's request for him to give his signature on new copies of the loan documents. See Bernstein v. Nemeyer, 213 Conn. 665, 672–73 (1990) ("It follows from an uncured material failure of performance that the other party to the contract is discharged from any further duty to render performances yet to be exchanged."); Restatement (Second) of Contracts § 237 (1981); JPMC Mem. at 6–8; JPMC Memorandum in Opposition to Motion for Partial Summary Judgment ("JPMC Opp.") (Doc. No. 65-1) at 6–8.

JPMC rests this argument on the assumption that it had a contractual right to require Osagie to re-sign the relevant documents. The court disagrees.

In support of its argument, JPMC claims to quote from two portions of the original mortgage contract. First, per JPMC's Memorandum, "under the heading of 'Errors and Omissions,'" the Agreement states:

> Errors and Omissions Agreement: The undersigned borrower(s), in consideration of a certain extension of credit by JPMorgan Chase Bank, N.A. the "Lender" to "Borrower(s)"... agree, if requested by the Lender or its agent, to fully cooperate in the correction, if necessary in the reasonable discretion of the Lender ; of any and all closing documents so that all documents accurately describe the agreement between the undersigned borrower(s) and the Lender and thus allow the Lender to sell, convey, seek a guaranty or obtain insurance for, or market said extension of credit to any purchaser. . . The undersigned borrower(s) further agree to comply with all above noted reasonable requests by the lender within thirty (30) days from the date of the mailing of the correction request(s) by the Lender.

JPMC Mem. at 7 (reproduced above as set forth in Memorandum); JPMC Opp. at 7–8. JPMC claims that this clause appears on the third page of the original agreement, but the court finds no such clause. A copy of the entire text (including page three) of the Open-End Mortgage Agreement (taken from Osagie's exhibits because JPMC did not submit as an exhibit a copy of the document) is attached as Exhibit I to this Ruling. JPMC, in its Memorandum, cites as the source of this clause Exhibits C and D to the Nauman Affidavit. Attached as Exhibit II to this Ruling are copies of Exhibits C and D to the Nauman Affidavit, neither of which is an agreement or contains this language. Thus, JPMC's argument in support of its Motion for Summary Judgment and in opposition to Osagie's Motion for Partial Summary Judgment on Count I that Osagie breached the contract by not re-signing documents fails insofar as it is based on this nonexistent clause.

Even taking at face value JPMC's factual claim that this term constitutes part of the loan agreement, the court nonetheless cannot conclude as a matter of law that any failure by Osagie to respond to JPMC's satisfaction to requests to re-sign documents—especially given that JPMC itself lost them, see Osagie L.R. 56(a)(1) Stmt. ¶ 7—constitutes a breach of this term. The purported term provides that Osagie will "fully cooperate in the correction, if necessary . . . of any and all closing documents so that all documents accurately describe the agreement," with the "necessity" of a given correction to be "in the reasonable discretion of [JPMC]." JPMC Mem. at 7 (emphasis added).

Even with the "reasonable discretion" provision, the court cannot conclude that having a party to an agreement re-sign a document that he already signed is a

"correction . . . so that [the] document[ ] accurately describe[s] the agreement." It appears to the court that this provision as to "correction" might provide a safety valve if the contract contains scriveners' errors—perhaps as to the procedural terms of the agreements or details such as the precise description of the plot of land relevant to the agreement. Re-signing a document that was already signed does not constitute a "correction" of the type that this term describes—to "accurately describe the agreement."

JPMC also points to the "FURTHER ASSURANCES; ATTORNEY-IN-FACT" section of the original agreement. See JPMC Mem. at 6–7. This states:

> **FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:
>
> **Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Credit Agreement, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.
>
> **Attorney-In-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

Open-End Mortgage Agreement at 3. JPMC argues that the duty to re-sign an agreement is comprised within the borrower's duty under this section to "make, execute and deliver . . . any and all such mortgages . . . as may, in the sole opinion of Lender, be necessary or desirable . . . to effectuate, complete, perfect, continue, or preserve [the parties' interests, duties, etc. under the agreement]." See JPMC Mem. at 7–8.

Any inadequacy that JPMC perceived in Osagie's responses to JPMC's requests to re-sign documents does not excuse JPMC's failure to honor Osagie's check.[5] The cited language does not require his action in the kind of circumstance presented in this case. This provision functions to ensure that the parties execute future agreements necessary to effectuate the present agreement, not unlike a covenant of good faith and fair dealing. It does not require the borrower to remedy the lender's failure, by incompetence or for whatever other reason, to retain a copy of the originally executed agreement—certainly not on risk of breach. A "further assurances" clause "addresses one of the transactional lawyer's primal fears[:] that the agreement may inadvertently fail to address a step required to consummate the transaction." Carl Circo, Why Is This Boilerplate in My Real Estate Contract?, 2005 Ark. L. Notes 1, 8–9 (2005) (quotation marks omitted). If the agreement contains such an omission from among its terms, a "further assurances" clause may save one party where there is a "last minute discovery that transfer of the real restate requires consent of a third-party or the assignment of a permit or license important for the operation of the property." Id.; see also Alliance

[5] Osagie provides evidence that he mailed a package to JPMC which he attests responded to JPMC's request for re-signed documentation. See Package Return Receipts. JPMC asserts that it never received anything. The court does not need to resolve whether there is a material issue of fact as to whether Osagie failed to re-sign documents because of its conclusion that Osagie had no obligation to do so.

Indus., Inc. v. Longyear Holdings, Inc., 854 F. Supp. 2d 321, 325, 333 (W.D.N.Y. Feb.

28, 2012); In re Winer Family Trust, 2006 WL 3779717, at *3 n.6 (3d Cir. Dec. 22,

2006); One Hundred Pearl Ltd. v. Vantage Securities, Inc., 1995 WL 117609, at *2

(S.D.N.Y. March 16, 1995).  This was not such a case.

Moreover, even if the court were to assume arguendo that Osagie breached a

duty under the aforementioned provision, it does not result in a material breach of the

contract.  The very next subparagraph, which JPMC omits from its Memorandum, see

JPMC Mem. at 6–7, provides what appears to be a make-whole remedy: the lender has

a power of attorney for the borrower to effectuate and protect the parties' intent,

interests, and duties under the Agreement.

2.      Failure to mitigate damages

JPMC argues in the alternative that Osagie cannot pursue his breach of contract

claim because he did not fulfill an obligation to mitigate his damages.  See Preston v.

Keith, 217 Conn. 12, 15 (1991); JPMC Mem. at 8–9.  Specifically, JPMC contends that,

when JPMC declined to honor Osagie's $4,000 check, Osagie had a duty to seek the

funds elsewhere and that he did not fulfill that duty.

Whether or to what extent an otherwise-prevailing party took steps to mitigate

damages may bear on the damages measurement of a contract claim such as this one.

"[T]he theoretical foundation for the plaintiff's duty to mitigate damages is that the

defendant's negligence is not the proximate, or legal, cause of any damages that could

have been avoided had the plaintiff taken reasonable steps to promote recovery and

avoid aggravating the original injury."  Preston, 217 Conn. at 16.  "The burden of proving

that the injured party could have avoided some or all of his or her damages . . .  rests on

the party accused of the tortious act." Id. at 21; see also Morro v. Brockett, 145 A. 659, 661 (Conn. 1929) ("[I]t becomes incumbent upon the defendant, if he seeks to exonerate himself from responsibility for a portion of the consequences [of an injury], to show that some of these had their proximate cause in the failure of the plaintiff to act in good faith in an attempt to promote recovery and avoid aggravation of the initial injury" (as quoted in Preston, 217 Conn. at 16)). It follows from the reasoning in these cases that a defendant can only entirely defeat a claim for breach of contract on the basis of failure to mitigate damages if the defendant shows that there is no material fact in dispute and that the evidence proffered establishes that the existence of any damages at all "had [its] proximate cause in the failure of the plaintiff to act in good faith in an attempt to promote recovery and avoid aggravation of the initial injury." Morro, 145 A. at 661.

Attempting to meet its burden here, JPMC proffers the following deposition testimony:

> Attorney Rich: Did you ask anyone for money, the $4,000.00?
> Mr. Osagie: Well, there was no one I could ask from. I knew their situations, you know. I am not going to go ask someone who has just been fired from his investment banking job to give me money.
> Attorney Rich: But you did not ask?
> Mr. Osagie: No. I didn't ask - - I couldn't ask them.
> Attorney Rich: Well, you could have asked but you chose not to; correct?
> Mr. Osagie: Well, I knew their situation. I am not going to exacerbate their situation by coming with something that is –

Osagie Depo. at 32:14–25. (Attorney Rich then interrupted Mr. Osagie to change the subject.) Osagie, meanwhile, attests that:

> A number of my friends and family were among the ["huge numbers" of newly unemployed Americans and others] around the world that were out of work and in financial distress [in 2008]. . . . I could not find an alternative source to replace

> the funds lost due to the actions of JPMC before July 25, 2008 and therefore could not complete my project.

Osagie Aff. ¶¶ 39–40.

Given the evidence that the parties present at this juncture, the court concludes that there is a disputed issue of fact whether Osagie breached his duty "to act in good faith in an attempt to promote recovery and avoid aggravation of the initial injury," or to what extent such a failure reduces JPMC's damages liability. Accordingly the court leaves for determination at trial whether Osagie's mitigation efforts were sufficient—and, if insufficient, whether such insufficiency eliminates all or only a part of JPMC's damages liability.

The court grants Osagie summary judgment as to the breach of contract claim, leaving the question of what damages, if any, were reasonably foreseeable to "the parties at the time they made the contract" for proof at trial. Joseph Bernhard & Son v. Curtis, 54 A. 213, 215–16 (Conn. 1903).[6]

B. Negligent or willful violation of the Fair Credit Reporting Act, 15 U.S.C. §1681s–2(b) (Count III)

Osagie purports to state two claims for violations of the FCRA. The first arises from JPMC's willful (or, in the alternative, negligent) failure to correct its reporting of the

---

[6] Given that the determination of damages remains open, the court notes that the Restatement (Second) of Contracts provides that, in general,

> the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender. However, in the less common situation in which the lender has reason to foresee that the borrower will be unable to borrow elsewhere or will be delayed in borrowing elsewhere, the lender may be liable for much heavier damages . . . .

Restatement (Second) of Contracts, § 351 cmt. (e). This rule is derived from the familiar principle of Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Rep. 145 (1854), that contract damages are limited to those reasonably foreseeable to the party in breach. Here, it appears to the court that Osagie could recover the full losses that he claims on his contract with Zembe-Arinze Company only if he showed that Chase could reasonably foresee, upon entering the loan contract, that its failure to perform would lead to Osagie's breach of the contract he had with Zembe-Arinze Company.

Account as "past due." See Complaint ¶ 64. The second arises from JPMC's willful (or negligent) failure to correct its reporting of the Account as a "Revolving Line of Credit" or "Line of Credit" or "Revolving" account. See id. Both parties move for summary judgment as to these claims. See JPMC MSJ at 1–2; Osagie Amended MPSJ at 1–2. The court denies both parties summary judgment.

"[T]o bring a claim under § 1681s–2(b), a plaintiff must establish three elements: (1) that he or she notified the consumer reporting agency of the disputed information, (2) that the consumer reporting agency notified the defendant furnisher of the dispute, and (3) that the furnisher then failed to investigate and modify the inaccurate information." Ausar–El v. Barclay Bank Delaware, 2012 WL 3137151, at *3 (D. Md. July 31, 2012).[7] Such failure to investigate and modify the disputed, inaccurate information results in civil liability if it occurs by actions of the defendant that are negligent, 15 U.S.C. § 1681o, or willful, 15 U.S.C. § 1681n.

Osagie alleges (1) that he notified all three credit reporting agencies that he disputed (a) the new characterization of the Account as a "revolving," "revolving line of credit," or "line of credit" account rather than a "mortgage" or "home equity line of credit" account, and (b) that the account was "past due"; (2) that the consumer reporting agencies notified JPMC of these disputes; (3) that JPMC failed to modify, delete, or block reporting of the disputed content (which result an adequate investigation would

---

[7] The court notes that JPMC disputes whether the Complaint can be construed to cover a claim under section 1681s–2(b), given its citations to 1681s–2(a). (JPMC argues that the latter provision does not provide a private right of action. See JPMC Mem. at 12–13.) Pro se pleadings, such as the Complaint, are to be read liberally. See Richardson v. United States, 193 F.3d 545, 548–49 (D.C. Cir. 1999) (holding that a district court's failure to consider a pro se plaintiff's filing in response to a motion to dismiss when construing the complaint was an abuse of discretion). The Complaint pleads facts sufficient to state claims under section 1681s–2(b) and to put JPMC on notice of the same. Accordingly, the court construes the Complaint to state claims under this subsection.

have required); (4) that JPMC's failure to remedy the relevant disputes in his favor was willful, or, in the alternative, negligent.  See Complaint ¶¶ 62–82.  Osagie also proffers evidence from which a reasonable jury could find for him on all elements of these two claims, including negligence or willfulness.  His Affidavit and the written responses that he received from credit reporting agencies evidence that he made complaints and that JPMC received notice of his disputes.  See Osagie L.R. 56(a)(1) Stmt. ¶¶ 41–47; Osagie Aff. ¶¶ 45–50; Equifax Report dated 12/9/2008 (Doc. No. 53-1 at 18) (reflecting response to investigation from JPMC); Transunion Report dated 12/9/2008 (Doc. No. 53-1 at 19–21); Experian Report dated 1/15/2009 (Doc. No. 53-1 at 22–26).  Presented with the same written responses from credit reporting agencies—reflecting that JPMC continued to classify Osagie's account as something other than a mortgage loan and to report it as past due—as well as the loan documents and Osagie's sworn statements about his account type and status, a reasonable jury could conclude that JPMC failed adequately to investigate and did so negligently or even willfully.  See Modified Agreement; Open-End Mortgage Agreement; see also Osagie Aff. ¶ 43 (JPMC told Osagie it would change its reporting of the Account's type as a penalty for Osagie's failure to continue paying on the Account).

Moreover, JPMC supports none of its denials of the facts that Osagie proffers with evidence.  Under the Local Rules, the effect of these omissions by JPMC results in Osagie's statements of undisputed material fact being taken as true.  See District of Connecticut Local Rule 56(a)(3).  In response to Osagie's statement of facts in pursuit of summary judgment as to JPMC's liability under the FCRA, JPMC violates this court's Local Rules by only flatly denying the facts that Osagie asserts or, rather implausibly,

stating that it has insufficient information to admit or deny the facts that he alleges. See JPMC L.R. 56(a)(2) Stmt. ¶¶ 41–47; see also supra note 1. It points to no evidence in the record to dispute Osagie's view of the facts. It does not dispute the allegation that it misdescribed Osagie's account in its reporting to the credit reporting agencies. Notably, it provides no evidence of any kind to show that it made any investigation—let alone one that did not constitute one that willfully or negligently violated section 1681s–2(b)'s requirements—to determine whether Osagie's complaints had any basis or merited changing Osagie's records.

Despite JPMC's failure to point to any evidence probative of its contentions, the court is not convinced that trial is unnecessary to determine whether JPMC is liable to Osagie under the FCRA. Osagie offers his own testimony about what he sought from the credit reporting agencies, see Osagie Aff. ¶¶ 45–50, but no documents representing his submissions to them. He has apparently not obtained (in any case, he does not provide) any communications between the credit reporting agencies and JPMC to show the nature of the dispute as described by the credit reporting agencies to JPMC. He does not produce any affirmative evidence at all about what steps JPMC took in response to any notice it received. The only relevant pieces of evidence he produces on this issue are his own sworn statements about communications between himself and the credit reporting agencies and between himself and JPMC and the written responses that he received from the credit reporting agencies after they had apparently made inquiries and received some kind of response from JPMC. See Equifax Report dated 12/9/2008 (Doc. No. 53-1 at 18) (reflecting response to investigation from JPMC); Transunion Report dated 12/9/2008 (Doc. No. 53-1 at 19–21); Experian Report dated

1/15/2009 (Doc. No. 53-1 at 22–26).  These reports reflect how JPMC reported the Account after Osagie's complaints, but little else.  Under these circumstances, even though it is largely as if "no opposing evidentiary matter [were] presented," the court is not convinced that Osagie has shown that "no material issue of fact remains for trial." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

JPMC also raises two affirmative arguments to refute its liability.  First, JPMC contends that Osagie did not meet the intermediate (i.e., through the credit reporting agencies) notice requirement—the second element in the foregoing description of the cause of action for a violation of section 1681s–2(b).  See JPMC Reply Mem. at 5–6; JPMC Opp. at 15.  This argument is meritless.  As the court noted supra, Osagie offers reports from the agencies reflecting that they notified JPMC of Osagie's disputes and that JPMC responded to these notifications.  See Equifax Report dated 12/9/2008; Transunion Report dated 12/9/2008; Experian Report dated 1/15/2009.  JPMC does not contest the accuracy of these reports and does not respond with any evidence of its own on this point.  The court rejects this argument.

JPMC's only other argument is that it is not liable because "Osagie has failed to produce any evidence that JPMC violated the investigative requirements of the credit bureaus that Osagie allegedly contacted with regard to disputed information."  JPMC Reply Mem. at 6 (emphasis added).  This reading is unsupported by case law and ignores the plain language of the statute.  The case law simply provides that, after receiving notice of a dispute from a credit reporting agency, an entity such as JPMC must not negligently or willfully fail to investigate the disputed information (and, if there was merit to the dispute, to take corrective action).  See, e.g., Seamans v. Temple

Univ., 744 F.3d 853, 864–65 (3d Cir. 2014); Alston v. Wells Fargo Bank, N.A., 2013 WL

4507607, at *5 (D. Md. Aug. 22, 2013) (proceeding from premise that liability turns

simply on falsity of information reported—not compliance with investigative

requirements of credit reporting agency); see 15 U.S.C. § 1681s–2(b)(1)(C), (D), (E).

    Moreover, JPMC does not offer—and the court cannot find—a single piece of

evidence describing the procedures to which JPMC may have adhered in responding to

the credit reporting agencies' notification of Osagie's dispute.  Given this blatantly

inadequate attempt to refute liability and the evidence that Osagie presents that JPMC

was notified, the court rejects this second argument.

    From all of the evidence before the court, a jury could conclude that JPMC is

liable to Osagie for a negligent, or perhaps even for a willful, violation of the Fair Credit

Reporting Act.  However, drawing all reasonable inferences in favor of nonmovant

JPMC, the court cannot say that no reasonable jury could find for JPMC.  The court

concludes that neither party is entitled to summary judgment on the question of JPMC's

liability for negligent or willful violations of section 1681s–2(b).  Both parties' Motions are

denied as to Count III.

    C.    Violation of the Connecticut Unfair Trade Practices Act (Count V)

    A CUTPA claim will succeed where (1) a defendant "engage[s] in . . . unfair or

deceptive acts or practices in the conduct of any trade or commerce," Conn. Gen. Stat.

42-110b(a), and, (2) "'as a result of' this act, the plaintiff suffer[s] an injury. The

language 'as a result of' requires a showing that the prohibited act was the proximate

cause of a harm to the plaintiff." Abrahams v. Young and Rubicam, Inc., 240 Conn.

300, 306 (1997).

JPMC contends that any assertion by Osagie of a claim under CUTPA fails for three reasons: first, Osagie actually just re-states a breach-of-contract claim and nothing more, and CUTPA does not provide for a cause of action for simple breach-of-contract claims; second, Osagie has asserted no "ascertainable loss;" and, third, Osagie has provided insufficient evidence of proximate causation.  See JPMC Mem. at 15–19.

          1.       Breach of contract claims unavailable under CUTPA

JPMC correctly asserts that Osagie cannot raise a simple contract claim under CUTPA.  See, e.g., Vega v. Sacred Heart Univ., Inc., 836 F. Supp. 2d 58, 64 (D. Conn. 2011).  However, JPMC is incorrect when it asserts further that Osagie fails to state a claim under CUTPA because he does not point to any deceptive or fraudulent practice independent of his bare breach-of-contract allegations.  See JPMC Mem. at 16–18.  Indeed, JPMC appears to ignore almost all of the allegations and evidence that Osagie presents.

At the very least, Osagie appears to intend to state a claim under CUTPA for JPMC's misrepresentation of, or failure to represent within a reasonable time or in a reasonable manner, the purported reason for the block on the Account.[8]  See Complaint

---

[8] Osagie may also be attempting to state claims under the following theories: first, JPMC's requiring that Osagie re-sign loan documents and its representation that the existence of this fault in the loan documentation was Osagie's, when actually the fault was JPMC's, see Complaint ¶¶ 55–57, 85, 86, 88; second, JPMC's breaching the contract with the false justification that Osagie was not entitled to JPMC's performance because he himself had breached the contract, see Letter dated 7/25/2008 from JPMC to Osagie (Doc. No. 53-1 at 12); third, JPMC's threatening to misrepresent, see id. ¶ 30; Osagie Aff. ¶ 43, and, fourth, actually misrepresenting, see Complaint ¶ 32, and, fifth, continuing to misrepresent after Osagie posted a dispute to the CRAs and to JPMC, see id. ¶¶ 33–34, 65–67, 77–79, 99, Osagie's account type and status to credit reporting agencies to induce Osagie to continue paying on the account and/or to sign a new agreement with JPMC, see id. ¶¶ 31, 92, 93.

    JPMC's Motion does not address each of these grounds independently, but only baldly claims that Osagie raises no theories besides breach of contract.  Because the court denies this sweeping basis for the Motion on the grounds that one of Osagie's theories is sufficient, the court deems it unnecessary to address at this time whether each and every theory that Osagie might raise under his Complaint is grounded upon sufficient evidence for a jury to find in Osagie's favor.

¶¶ 84–85; Osagie L.R. 56(a)(1) Stmt. ¶ 10; Osagie Aff. ¶¶ 15, 31, 33 (stating that, during a telephone call by Osagie to JPMC, JPMC representatives told Osagie that it would only give him a response by mail, even though Osagie explained the urgency of the situation and prior communications related to formation of agreement had been by phone, fax, or email); Letter from JPMC to Osagie dated 7/16/2008 (Doc. No. 53-1 at 11) (stating that reason for block was that his check "would exceed the available credit limit on your account"); Letter from JPMC to Osagie dated 7/25/2008 (Doc. No. 53-1 at 12) (stating that JPMC "ha[d] not received the needed signed documentation from" Osagie).  These facts and this theory are sufficient to raise a question for the jury whether JPMC not only breached its contract with Osagie but also committed unfair or deceptive trade practices.  See Tessmann v. Tiger Lee Constr. Co., 228 Conn. 42, 55 (1993) (affirming award of punitive damages for CUTPA violation where defendant contracted to build home for the plaintiffs and then "exhibited a reckless disregard of the plaintiffs' rights" by building an obviously shoddy home, refusing to make repairs, and attempting to "t[ake] advantage of the plaintiffs").  Thus, the court rejects this basis for JPMC's Motion on Count V.

      2.    Ascertainable loss

JPMC's second argument is that Osagie has stated no CUTPA claim because he has not shown any "ascertainable loss."  See JPMC Mem. at 15–16; Hinchliffe v. Am. Motors Corp., 184 Conn. 607, 614–15 (1981).  Specifically, JPMC states, Osagie has not offered evidence that "prove[s] . . . specifically defined damages;" he "cannot quantify his damages."  JPMC Mem. at 16.

This argument is frivolous. The Supreme Court of Connecticut has explicitly "h[e]ld that the words 'any ascertainable loss' as used in [CUTPA] do not require a plaintiff to prove a specific amount of actual damages" to establish liability under CUTPA, and that "there is no need to allege or prove the amount of the ascertainable loss." Hinchliffe, 184 Conn. at 612–13, 614.[9] A "plaintiff[ ] demonstrate[s] that [he] suffered an ascertainable loss when [he] produce[s] evidence fairly suggesting that, as a result of an unfair or deceptive trade practice, [he] received something different from that for which [he] had bargained." Id. at 619. In claiming that he lost, inter alia, his upfront costs and his pre-determined fee from the agreement with Zembe-Arinze, as a consequence of the actions of JPMC that the court has just recited, see Osagie Depo. at 44:10–14, Osagie has more than adequately met this standard. The court rejects this second basis for JPMC's motion as to Osagie's CUTPA claim(s).

3. Proximate causation

JPMC's third argument is that Osagie fails to "prove causation," that "whatever damages Osagie claims are speculative at best." JPMC Mem. at 16; see also id. at 18–19. In other words, JPMC contends that Osagie has not proven proximate causation of any damages that he alleges. The question here is whether, "on the basis of the evidence [presented], a fair and reasonable person could conclude only that the [facts alleged as CUTPA violations] did not cause the plaintiff's injuries." Haesche v. Kissner, 229 Conn. 213, 217 (1994). Osagie presents evidence that JPMC knew of Osagie's need for funds and that, although he tried to move his deadlines and he sought funding

[9] JPMC's Memorandum on this point is odd. Where it makes this argument, JPMC states, "Osagie has failed to offer [inter alia] deposition testimony . . . to prove . . . specifically defined damages." JPMC Mem. at 16. On just the previous page, JPMC states correctly that, "at his deposition, Osagie testified that he was claiming damages totaling $1,285,850.86." JPMC Mem. at 15.

from other sources, because JPMC first blocked his $4,000 check he was unable to fulfill his obligations to Zembe-Arinze, and Zembe-Arinze thus terminated the contract with him.  See Osagie Aff. ¶¶ 31, 33, 40, 41.  A reasonable jury could conclude that JPMC's actions were the proximate cause of Osagie's inabiltiy to recoup his expenditures or receive his fee.  Thus, this last argument does not rest on undisputed facts and is insufficient to sustain JPMC's Motion for Summary Judgment.

For all of the foregoing reasons, the Motion is denied as to this Count.

D.   Breach of the implied covenant of good faith and fair dealing (Count II)

With regard to Osagie's claim that JPMC breached the implied covenant of good faith and fair dealing, JPMC moves for summary judgment on the ground that Osagie has come forward with no facts supporting the claim element that JPMC acted in bad faith.  See JPMC Mem. at 9–12.

The duty of good faith and fair dealing, implied in every contract, "requir[es] that neither party do anything that will injure the right of the other to receive the benefits of the agreement."  Gupta v. New Britain Gen. Hosp., 239 Conn. 574, 598 (1996).  A party breaches this duty when (1) it is in a "contract or contractual relationship" with another party, (2) it "impedes the [other]'s right to receive benefits that he or she reasonably expected to receive under the contract," and (3) it does so "in bad faith."  De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 432–33 (2004).  For the purposes of this kind of claim, a party to a contract acts in "bad faith" if it "impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract," and does so "in bad faith."  Id. at 433.  "Bad faith" requires "[1] actual or constructive fraud, or [2] a design to mislead or deceive another, or [3] a neglect or

refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive."  Habetz v. Condon, 224 Conn. 231, 237 (1992) (as quoted in De La Concha, 269 Conn. at 433).

Although intent is generally an issue for the jury to decide, a plaintiff is not entitled to have a claim go to the jury where his only support for the intent element is a bare assertion of bad faith.  See Multi-Service Contractors, Inc. v. Town of Vernon, 193 Conn. 446, 452 (1984).  Here, JPMC argues that Osagie presents nothing more than assertions.  This is incorrect.  Osagie has indeed provided evidence that JPMC acted in bad faith, e.g., by ignoring his attempts to have JPMC explain why it did not honor his check and to remedy the harm he alleges that JPMC caused him before Zembe-Arinze voided its contract with Osagie, see Osagie L.R. 56(a)(1) Stmt. ¶ 10; Osagie Aff. ¶¶ 15, 31, 33, and by stating it would change its characterization of the Account to punish him for failing to pay despite his grievances, see id. ¶ 43; see also De La Concha, 269 Conn. at 442 (noting that analyses of scienter requirements for CUTPA and good faith and fair dealing are similar).  As a consequence, granting summary judgment to JPMC on this basis would be inappropriate.  JPMC's Motion is denied as to this Count.

    E.    Negligence (Count IV)

Osagie asserts a claim for negligence arising out of, inter alia, JPMC's failure to comply with the duties of care imposed by the Fair Credit Reporting Act.  See generally discussion supra Section III.B.  "The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury."  LePage v. Home, 262 Conn. 116, 123 (2002) (internal quotation marks omitted).

JPMC's only argument that it is entitled to summary judgment on this Count is that the economic loss doctrine bars a claim by Osagie for negligence because Osagie seeks damages in tort "from the same underlying factual allegations as a breach of contract claim." JPMC Mem. at 14; see also Ulbrich v. Groth, 310 Conn. 375, 410 (2013) (holding that "the economic loss doctrine bars negligence claims that arise out of and are dependent on breach of contract claims"). JPMC fails to recognize that Osagie does not predicate his negligence claims upon JPMC's breach of his contract. Osagie relies, inter alia, on the duties imposed by the Fair Credit Reporting Act. See discussion supra Sections III.B–D. The court denies JPMC's Motion as to this Count.

## IV. CONCLUSION

Osagie's Motion for Partial Summary Judgment (Docs. No. 51, 62) is hereby **GRANTED IN PART** as to liability on the contract claim (Count I) and **DENIED IN PART** as to liability on the FCRA claim (Count III). JPMC's Motion for Summary Judgment (Doc. No. 55-1) on all counts is hereby **DENIED**. Liability remains to be determined on Counts II, III, IV, and V, and damages on Count I.

**SO ORDERED.**

Dated at New Haven, Connecticut this 29th day of September 2014.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge

# EXHIBIT I

VOL 1538 PAGE 1110

WHEN RECORDED MAIL TO:
TransUnion Settlement Solutions — Servicing KY2-1606
5300 Brandywine Parkway
Suite 100
Wilmington, DE 19803

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE ONLY

## OPEN - END MORTGAGE

MAY 8 2003

MAXIMUM LIEN. The lien of this Mortgage shall not exceed at any one time $82,000.00.

THIS MORTGAGE dated May 2, 2003, is made and executed between ABEL O OBABUEKI and ALABA S OBABUEKI, HUSBAND AND WIFE, whose address is [redacted] DRIVE SOUTH, [redacted] CT [redacted] (referred to below as "Grantor") and Bank One, NA , whose address is 100 East Broad Street, Columbus, OH 43271 (referred to below as "Lender").

GRANT OF MORTGAGE. For valuable consideration, Grantor gives, grants, bargains, sells, assigns and confirms unto Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in FAIRFIELD County, State of Connecticut:

ALL THAT CERTAIN TRACT, PIECE OR PARCEL OF LAND, WITH THE BUILDINGS THEREON, SITUATED IN THE TOWN OF DANBURY, COUNTY OF FAIRFIELD AND STATE OF CONNECTICUT AND DELINEATED AS LOT NO. 29 ON A CERTAIN MAP ENTITLED, MAP PERPARED FOR PACE BUILDERS, INC. DANBURY CONNECTICUT, TOTAL AREA 81 469 ACRES RU-20 RES. ZONE SCALE 1 INCH EQUALS 100' AND CERTIFIED 'SUBSTANTIALLY CORRECT' HENRICIS, LAND SURVEYOR, WHICH MAP IS DATED JULY 30, 1969 AND IS FILED ON THE DANBURY LAND RECORDS AND BEARS MAP NO 4650. TOGETHER WITH THE RIGHT TO PASS AND REPASS OVER ALL ROADS AS SHOWN ON SAID MAP. SAID PREMISES ARE FURTHER DESCRIBED AS FOLLOWS: NORTHERLY: 195.84 FEET BY LOT 30, AS SHOWN ON SAID MAP; EASTERLY: 135 05 FEET BY LAND NOW OR FORMERLY OF JOSEPH PALINKAS, ET UX; SOUTHERLY: 193.61 FEET BY LOT 28, AS SHOWNON SAID MAP; AND WESTERLY: 135.00 FEET BY ROAD DESIGNATED AS [redacted] DRIVE AS SHOWN ON SAID MAP.

The Real Property or its address is commonly known as [redacted] DRIVE SOUTH, [redacted], CT [redacted]. The Real Property tax identification number is F20-47.

REVOLVING LINE OF CREDIT. Specifically, in addition to the amounts specified in the Indebtedness definition, and without limitation, this Mortgage secures a revolving loan agreement , make advances to Grantor so long as Grantor complies with all the terms of the Credit Agreement. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. It is the intention of Grantor and Lender that this Mortgage secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in this Mortgage and any intermediate balance.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

TO HAVE AND TO HOLD, the Property, with the privileges, and appurtenances of the Property, unto Lender, its successors and assigns forever, to its and their own proper use and behoof.

AND ALSO, Grantor, for Grantor and Grantor's heirs, executors and administrators, covenants with and warrants to Lender, its successors and assigns, that at and until the ensealing of this Mortgage, Grantor is well seized of the Real Property as a good indefeasible estate in fee simple, that Grantor has good and absolute title to the Personal Property, and that Grantor has good right to give, grant, bargain, sell, assign and convey the Property in manner and form as is above written, and that the Property is free and clear of all liens, encumbrances and exceptions to title whatsoever (other than those set forth in any policy of title insurance issued in favor of, and accepted by, Lender in connection with this Mortgage).

AND FURTHERMORE, Grantor does by this Mortgage bind Grantor and Grantor's successors and assigns forever to WARRANT AND DEFEND the Property to Lender, its successors and assigns, against all claims and demands whatsoever, except as set forth in the title policy, if any.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage and under any Related Documents.

POSSESSION AND MAINTENANCE OF THE PROPERTY. Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other

person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Connecticut law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for the Existing Indebtedness referred to in this Mortgage or those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and permissible fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims (B) to provide any required insurance on the Property, or (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit

OSA000102

Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Property also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.** All promises, agreements, and statements Grantor has made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as Grantor's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Mortgage:

**Existing Lien.** The lien of this Mortgage securing the Indebtedness may be secondary and inferior to the lien securing payment of an existing obligation. The existing obligation has a current principal balance of approximately $149800. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall execute financing statements and take whatever other action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall assemble the Personal Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Credit Agreement, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Grantor will be in default under this Mortgage if any of the following happen:

(A) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition.

(B) Grantor does not meet the repayment terms of the Credit Agreement.

(3) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding any transfer of title to the Property in extinguishment of the Indebtedness, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness, and to exercise any other powers permitted by applicable law. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judgment foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Credit Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender, or any court having jurisdiction to foreclose this Mortgage, shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender will give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition.

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Mortgage, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**Expenses.** To the extent not prohibited by applicable law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights, shall become a part of the loan payable on demand, and shall bear interest at the Note rate from the date of expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's expenses for bankruptcy proceedings (including efforts to modify or vacate the automatic stay or injunction) and appeals, to the extent permitted by applicable law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any person may change his or her address for notices under this Mortgage by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender. Notwithstanding the foregoing, the address for notice for Lender is: Bank One, P.O. Box 901008, Fort Worth, TX 76101-2008.

**WAIVER OF HOMESTEAD EXEMPTION.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the state where the Grantor resides as to all indebtedness secured by this Mortgage/Deed of Trust.

**NON-WAIVER.** A waiver by any party of a breach of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision.

**IDENTITY OF LENDER.** Lender is Bank One, N.A., a national banking association with its main offices located in Columbus, Ohio.

**SUPPLEMENT TO PERSONAL PROPERTY DEFINITION.** It is the intention of Lender only to take a security interest in and retain a lien on that personal property considered fixtures under the Uniform Commercial Code as adopted in the jurisdiction where this Mortgage is filed of record as same may be amended from time to time or such other statute of such jurisdiction that defines property affixed to real estate and no other personal property.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** What is written in this Mortgage and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Mortgage. To be effective, any change or amendment to this Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This agreement will be governed by and interpreted in accordance with federal law and the laws of the State of Connecticut, except for matters related to interest and the exportation of interest, which matters will be governed by and interpreted in accordance with federal law (including, but not limited to, statutes, regulations, interpretations, and opinions) and laws of the State of Ohio. However, if there ever is a question about whether any provision of the agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction which is evidenced by this and other related documents has been approved, made and funded, and all necessary documents have been accepted by Lender in the State of Ohio.

OSA000104

**Joint and Several Liability.** All obligations of Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean

each and every Grantor. This means that each Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Grantor understands Lender will not give up any of Lender's rights under this Mortgage unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Mortgage. Grantor also understands that if Lender does consent to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor to the extent allowed by law.

**Severability.** *If a court finds that any provision of this Mortgage is not valid or should not be enforced, that fact by itself will not mean that the rest of this Mortgage will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Mortgage even if a provision of this Mortgage may be found to be invalid or unenforceable.*

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage:

**Borrower.** The word "Borrower" means ABEL O OBABUEKI and ALABA S OBABUEKI, and all other persons and entities signing the Credit Agreement.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated May 2, 2003, in the original principal amount of $82,000.00 from Grantor to Lender, a copy of which is made a part of this Mortgage and attached to this Mortgage as an Exhibit, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of this Mortgage is May 2, 2023.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

**Grantor.** The word "Grantor" means ABEL O OBABUEKI and ALABA S OBABUEKI.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. **In addition, and without limitation, the term "Indebtedness" includes all amounts identified in the Revolving Line of Credit paragraph of this Mortgage. However, the term "Indebtedness" is subject to the limitations identified in the Maximum Lien section of this Mortgage.**

**Lender.** The word "Lender" means Bank One, NA , its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**OPEN-END MORTGAGE.** This is an OPEN-END MORTGAGE, and the holder of this Mortgage shall have all the rights, powers and protections authorized and allowed by Section 49-2 of the Connecticut General Statutes and by other statutes and applicable law, subject only to such limitations as are imposed by law. Lender is specifically permitted, at its option and in its discretion, to make additional loans or advancements under this Mortgage as contemplated by Section 49-2 (c) of the Connecticut General Statutes, and each and every such loan or advancement shall be secured by this Mortgage equally with, and with the same priority over other claims as, the amounts initially disbursed in respect of the Indebtedness evidenced by the Credit Agreement.

OSA000105

# EXHIBIT II

# EXHIBIT C

EXHIBIT C

Chase Home Finance LLC (OH4-7304)
3415 Vision Drive
Columbus, OH 43219-6009
(800) 836-5656 Customer Care

July 25, 2008

00311-01 IF1A 214-000000000000

Abel Osagie
Dr S
, CT

Re: Home Equity Account ********3636

**Block Information**

Dear Abel Osagie:

Thank you for contacting Chase about your home equity line of credit account.

We have received your request for information why the account was blocked. This was blocked because Chase has not recieved the needed signed documentation from you to record collateral documents. Once the said signed documents are received then Chase can remove the block from your account.

Chase's goal is to provide the highest level of quality service to each of our customers. If you have any questions, please contact Customer Care at (800) 836-5656.

We appreciate your business and value our relationship with you.

Sincerely,

Jovel Conde
Customer Care Professional
Customer Care

# EXHIBIT D



EXHIBIT D

CHASE

Chase Home Finance LLC
1820 East Sky Harbor Circle, S.
Phoenix, AZ 85034-9701
Collections Department
(800) 219-6659

October 20, 2008

27917 0000392 001
OSAGIE, ABEL
OSAGIE, ALABA S
[redacted] CT [redacted]

FIRST CLASS MAIL

**Acceleration Warning (Notice of Intent to Foreclose)**
Account #: [redacted]3636 (the "Loan")
Property Address: [redacted] Drive South
Ct [redacted] (the "Property")

Dear Mortgagor(s):

Our records indicate that your Loan is in default and you have breached the terms of the Mortgage, Security Deed, or Deed of Trust ("Mortgage") securing the Loan.

Under the terms of the Mortgage, you are hereby notified of the following:

1. You are in default because you have failed to pay the required monthly installments commencing with the payment due August 15, 2008, late charges and fees incurred or paid on your behalf.
2. As of October 20, 2008, principal, interest, escrow, late fees, and charges/fees of $5139.68 are past due.
3. If there is reason to dispute the debt, or any portion thereof, you must notify Chase Home Finance LLC within 30 days of this notice. Otherwise, Chase Home Finance LLC will consider the debt validated.
4. Action required to cure default: You must pay the total amount set forth in Paragraph 2 and all monthly installments, fees and other charges, which become due or are paid on your behalf after the date of this notice.
5. If you fail to cure the default within 30 days from the date of this notice, Chase Home Finance LLC intends to accelerate the maturity of the Loan, terminate your credit line if the Loan provides for revolving advances, declare all sums secured by the Mortgage immediately due and payable, and commence foreclosure proceedings. If this happens, Chase Home Finance LLC will be entitled to collect its expenses incurred in pursuing the remedies provided in the Mortgage, including, but not limited to, reasonable foreclosure/attorneys' fees and costs of title evidence.
6. You have the right to reinstate after acceleration and the right to bring a court action to dispute the existence of a default, or any other defense to acceleration, foreclosure, and sale.

Generic/103006

Osagie,Abel
Page Two
October 20, 2008

7. The total amount due is required in the form of Certified Funds and should be remitted to:

| Regular Mail: | HE Default Payment Processing<br>Mailcode OH4-7164<br>Chase Home Finance LLC<br>P.O. Box 24785<br>Columbus, OH 43224-0785 | Overnight Mail: | HE Default Payment Processing<br>Mailcode OH4-7164<br>Chase Home Finance LLC<br>3415 Vision Drive<br>Columbus, OH 43219 |
|---|---|---|---|

8. If you are unable to pay the amount past due, Chase Home Finance LLC has a variety of programs,which might help you resolve your default. However, we need to talk to you to discuss these options and which of them might be appropriate for your circumstances. Please call us as soon as possible at (800) 219-6659.

9. While the loan remains in default, we will perform certain tasks to protect our interest in the property. One of the tasks that we will perform at regular intervals during the default is to visit your property. This will be done to determine, as of the date of the inspection, the property condition, occupancy status, and possibly your plans for curing the default and paying this loan on time. You can anticipate that any costs incurred by Chase Home Finance LLC will be added to the amount you now owe.

For California customers, the state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 a.m. or after 9 p.m. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftc.gov.

Chase Home Finance LLC does not offer homeownership counseling services to borrowers. Such counseling is available through a variety of non-profit organizations experienced in homeownership counseling and approved by the Secretary of Housing and Urban Development (HUD). A listing of such organizations may be obtained by calling HUD toll-free at (800) 569-4287.

Colorado customers may contact the Colorado Foreclosure hotline at (877) 601-4673 or a Chase Loss Mitigation specialist at (866) 582-5208 to discuss alternatives to foreclosure.

Chase Home Finance LLC is attempting to collect a debt and any information obtained will be used for that purpose.

We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**If you have received a discharge from the Bankruptcy Court, you are not personally liable for payment of the Loan and this notice is for compliance and informational purposes only. However, Chase Home Finance LLC still has the right under the Mortgage to foreclose on the Property.**

Sincerely,

OSA000402

Collections Department